

# Fourth Court of Appeals

## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-15-00082-CV

**In the Interest of R.C.**, a Child

From the 288th Judicial District Court, Bexar County, Texas
Trial Court No. 2013-PA-00544
Honorable Charles E. Montemayor, Judge Presiding

Opinion by: Jason Pulliam, Justice

Sitting: Marialyn Barnard, Justice
Patricia O. Alvarez, Justice
Jason Pulliam, Justice

Delivered and Filed: July 8, 2015

AFFIRMED

Appellant J.C. ("Father") appeals the trial court's judgment terminating his parental rights

to his child R.C.[1]  We affirm the trial court's judgment.

## PROCEDURAL HISTORY

On December 20, 2012, the Department of Family and Protective Services ("the

Department") received a referral alleging Father's abuse of H.F., R.C.'s older half-brother.  Father

is R.C.'s biological father, and H.F.'s stepfather.  At the time of the referral, H.F. was eight years

old, and R.C. was fourteen months old.  H.F. and R.C. lived at Haven for Hope homeless shelter

---

[1] To protect the identity of the minor child, we refer to the child and the child's parents by their initials. *See* TEX. FAM. CODE ANN. § 109.002(d) (West 2014); TEX. R. APP. P. 9.8(b)(2).  Although the trial court terminated both parents' parental rights, because Father is the only parent to appeal the trial court's judgment, this court will only discuss the trial court's judgment as it pertains to Father.

with Father. C.F., the children's biological mother did not live with the children; she worked as a truck driver and stayed on the road.

During its investigation after the referral, the Department received a report from H.F.'s school that several teachers and students had observed Father give H.F. an inappropriate kiss on the mouth. In a face-to-face interview, H.F. told a Department caseworker Father would sometimes play with his private parts. Further, the Department learned H.F. suffered from a number of psychological and physical disorders which manifested in violent and aggressive behavior. Although doctors prescribed H.F. medication for the disorders, Father stopped administering that medication to H.F. Based upon these and other findings drawn from its investigation, the Department removed H.F. and R.C. from Father's custody on March 5, 2013, and filed a petition for termination of the parental rights of Father and C.F. on March 6, 2013.

On March 18, 2013, the trial court held an adversarial hearing under Texas Family Code Section 262.201 (West 2014), both Father and C.F. were present and represented by counsel. Following the hearing, the trial court appointed the Department as the temporary managing conservator of H.F. and R.C. and Father as temporary possessory conservator of R.C only. The trial court permitted Father twice monthly supervised visits with R.C. and established a Family Service Plan which required Father to meet certain goals to regain custody of R.C.

The trial court held a status hearing on May 6, 2013, and permanency hearings on September 9, 2013, January 6, 2014, and April 28, 2014. The Family Service Plan established on May 6, 2013 stated the permanency goal was to reunite R.C. with Father. The permanency hearings revealed Father refused to sign the Family Service Plan, refused to comply with most of its terms, and exhibited resistance to the Department and the trial court. Therefore, the Department proceeded with termination of Father's parental rights.

The parties tried the case to the bench beginning on August 28, 2014, and continuing on October 29, 2014, and December 19, 2014. Father was present for each day of trial and was represented by counsel. Before the final day of trial, C.F. voluntarily relinquished her parental rights to H.F. and R.C. After receipt of evidence and testimony, the trial court rendered judgment terminating Father's parental rights to R.C. based upon the following statutory grounds: (1) Father constructively abandoned R.C., who was in possession of the Department for not less than six months, and the Department made reasonable efforts to return R.C., Father did not regularly visit or maintain significant contact with R.C., and Father demonstrated an inability to provide R.C. with a safe environment, pursuant to Texas Family Code Section 161.001(1)(N); and (2) Father failed to comply with the provisions of a court order that specifically established the actions necessary for Father to obtain the return of R.C. who had been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of R.C.'s removal from Father under Chapter 262 for the abuse or neglect, pursuant to Texas Family Code Section 161.001(1)(O). The trial court also found termination of Father's parental rights to be in the best interest of R.C., pursuant to Texas Family Code Section 161.001(2). Father perfected this appeal.

### ANALYSIS

On appeal, Father contends the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights is in R.C.'s best interest.

### Standard of Review

To support termination of parental rights, the Department must establish by clear and convincing evidence one or more of the acts or omissions enumerated under subsection (1) of Family Code § 161.001 **and** termination is in the best interest of the child. TEX. FAM. CODE ANN. §§ 161.001(1), (2); TEX. FAM. CODE ANN. § 161.206(a) (West 2014); *In re J.F.C.*, 96 S.W.3d 256,

263 (Tex. 2002). Both elements must be established, and termination may not be based solely on the best interest of the child. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

A parent's right to the companionship, care, custody, and management of children is a constitutional interest "far more precious than any property right." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see also In re J.F.C.*, 96 S.W.3d at 273. Consequently, termination proceedings must be strictly scrutinized, and "involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20. Because termination "is complete, final, irrevocable, and divests for all time that natural right ... the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Id.*; *see In re J.F.C.*, 96 S.W.3d at 264-66. Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014); *In re J.F.C.*, 96 S.W.3d at 264. This standard guards the constitutional interests implicated by termination, while retaining the deference an appellate court must have for the factfinder's role. *In re J.F.C.*, 96 S.W.3d at 265-66. An appellate court must not reweigh issues of witness credibility but "'must defer to the [factfinder's] determinations so long as those determinations are not themselves unreasonable.'" *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (quoting *Southwestern Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004)).

Under the strict scrutiny implicit in termination cases and the necessity of clear and convincing evidence, the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 264–66. Instead, in conducting a legal sufficiency review in a termination-of-parental-rights case, an appellate court must view all of the evidence in the light most favorable to the finding and determine whether a reasonable factfinder could have formed a firm belief or

conviction that its ultimate findings are true. *See id.* at 266. In viewing the evidence in the light most favorable to the judgment, the appellate court "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* If, after conducting its legal-sufficiency review of all the evidence, a court determines no reasonable factfinder could form a firm belief or conviction consistent with the final judgment, then the court must conclude the evidence is legally insufficient. *In re J.F.C.*, 96 S.W.3d at 264-66.

In conducting a factual sufficiency review in a parental-rights termination case, the appellate court must review and consider the entire record, including evidence contrary to the judgment, and determine whether the disputed evidence is such that a reasonable factfinder could have formed a firm conviction or belief about the truth of the Department's allegations. *Id.* We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence a reasonable factfinder could have disbelieved. *Id.* In reviewing factual sufficiency, we consider whether the disputed evidence is such that a reasonable factfinder could not have formed a resolution consistent with its finding. *Id.*

### Best Interest of the Child

When considering the best interest of the child, a trial court must operate under a strong presumption that the child's best interest is served by preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, prompt and permanent placement of the child in a safe environment is also in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (West 2014). To determine the best interest of the child, the court may consider the following factors: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental

abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *Id.* In analyzing these factors, the court must focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).

Further, the same evidence proving acts or omissions under Family Code Section 161.001(1) may be also probative of best interest of the child. *In re C.H.*, 89 S.W.3d at 28. A factfinder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent. *In re B.K.D.*, 131 S.W.3d 10, 17 (Tex. App.—Fort Worth 2004, pet. denied). Additionally, conduct endangering the well-being of one child under the parent's care can be considered in relation to other children under that parent's care. *In re E.C.R.*, 402 S.W.3d 239, 248 (Tex. 2013).

Turning to the evidence regarding the best interest of the child, we consider the *Holley* factors as outlined above:

### *Desires of the Child*

As to the first factor, R.C.'s desire for placement, the evidence weighs in favor of the trial court's finding. Father argues R.C. is too young to express his desires, therefore this factor cannot

be considered. However, when a child is too young to express its desire, the factfinder may consider whether the child has bonded with its current care giver, is well-cared for, and whether the child has spent minimal time with the parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

At the conclusion of trial, R.C. was three years old. In the twenty-one month span since the Department removed R.C. from Father's custody, Father had limited contact with R.C. Four months after removal, the trial court terminated Father's visitation rights on the Department's motion based upon the recommendation of therapist Carlos Castillo. Based upon behavior exhibited during the therapy sessions, Castillo reported Father's erratic behavior endangered R.C. In its order, the trial court indicated visitation would be reinstated if Father continued therapy and showed improved behavior in subsequent therapy sessions. However, Father attended only two more therapy sessions and exhibited the same aggressive behavior during both sessions. Father had no further contact with R.C. for the remainder of the proceedings against him.

The Department caseworker, Natasha West, testified R.C. had been placed with a foster family, had acclimated to that family, and was well cared for. The foster parents filed an intervention in the suit seeking the opportunity to adopt R.C.

### Physical and Emotional Needs

With regard to the second factor, R.C.'s physical and emotional needs now and in the future, the evidence weighs in favor of the trial court's finding. A child's need for permanence is a paramount consideration for the child's present and future physical and emotional needs. *See Dupree*, 907 S.W.2d at 87. The goal of establishing a stable, permanent home for a child is a compelling government interest. *In re M.A.N.M.*, 75 S.W.3d 73, 77 (Tex. App.—San Antonio 2002, no pet.). A factfinder may infer from a parent's past inability to meet a child's physical and

emotional needs an inability or unwillingness to meet a child's needs in the future. *In re J.D.*, 436 S.W.3d at 118.

Although Father contends the Department failed to prove he could not meet R.C.'s needs, the evidence established Father had not provided a stable home for R.C. before removal and failed to show he could do so in the future.

The evidence adduced at trial shows Father and the children lived an itinerant life for several months preceding the removal. Father testified he, C.F., and the children lived in Huntsville. In October 2012, a time close to R.C.'s first birthday, C.F. left the family to work for an interstate trucking company. At the same time, Father moved the children to California where they stayed for a month, then moved to San Antonio. When they arrived in San Antonio, Father and the children lived in a motel room. Father testified he begged churches to take the children so he "could get back on [his] feet." On December 10, 2012, Father and the children moved into Haven for Hope homeless shelter, where they stayed for three months. The family was in the shelter when the Department removed the children.

At the May 6th status hearing, the trial court established a Family Service Plan which required Father provide information to the Department regarding his residence and employment. West testified at trial that Father never provided her with any information regarding his living situation, nor any information regarding his employment. Father gave West his telephone number, but with the exception of a few text messages in which Father would ask West to convey messages to the children, Father never contacted her or provided the required information.

Father testified that in January of 2013, he terminated his phone service and never gave West another phone number where he could be reached. Correspondence sent to the address Father provided the department went unanswered. Father testified he had a stable residence, but when asked for specific information, asserted instead that he could procure housing immediately if the

children were returned to him. Father testified he had been employed with a trucking company for four months, but when questioned about his income during that time, he stated he did not know or refused to answer.

Based upon this evidence presented by the Department and through Father's testimony, the trial court could reasonably conclude Father would not be able to provide a stable home for R.C. in the future. Father's inability to provide R.C. with a stable, permanent home indicates he could not provide for R.C.'s physical and emotional needs. *See Dupree*, 907 S.W.2d at 87. This evidence supports the trial court's finding that Father will not be able to meet R.C.'s physical and emotional needs in the future. *See In re J.D.*, 436 S.W.3d at 118.

### *Physical and Emotional Danger*

The third factor, present and future physical and emotional danger to R.C., weighs in favor of the trial court's finding. A trial court may examine the parent's history with other children when considering the risks or threats of a parent's environment. *In re E.A.F.*, 424 S.W.3d 742, 751 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *see In re E.C.R.*, 402 S.W.3d at 248. Additionally, courts can consider evidence of a history of substance abuse by the child's family. TEX. FAM. CODE ANN. § 263.307(8) (West 2014). Moreover, abusive, violent, illegal or inappropriate conduct by a parent or other resident of a child's home, or with whom a child is compelled to associate on a regular basis, inherently produce an environment that endangers the physical or emotional well-being of a child. *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied); *see In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

Evidence presented by the Department and by Father shows H.F. suffered from a number of psychological problems and physical disabilities which manifested in aggressive and violent behavior; however, Father failed to properly provide H.F. with the medication used to manage these disorders. Father told the Department that, without consultation with a doctor, he stopped giving H.F. the medication because H.F. began to exhibit negative side effects. West testified that while in the custody of the Department, H.F. was placed in a therapeutic home, and his behavior had improved.

Further, after C.F. relinquished her parental rights, she testified that both she and Father used crack-cocaine when they both were with the children. Father disputed this testimony, stating he had been sober since December of 2009 (prior to R.C.'s birth), when H.F. was five years old. Father did submit to one drug test during the pendency of the suit, the results of which were negative. West testified she sent Father notices of other drug tests, but Father submitted to no additional tests.

Based on this evidence, the trial court could reasonably conclude R.C.'s physical and emotional well-being would be in danger if he were returned to Father. Although the record indicates R.C. does not have any special needs, the evidence presented of Father's lack of ability to care for H.F.'s medical needs, as well as evidence of H.F.'s improved condition while in the Department's custody is suggestive of a risk of danger for R.C. if he were returned to Father's custody. *See E.A.F.*, 424 S.W.3d at 751. Further, evidence of the use of illegal drugs, combined with evidence establishing Father could not provide R.C. with a stable home indicates R.C. would face an uncertain and unstable life should he be returned to Father's custody. *See B.R.*, 822 S.W.2d at 106; *R.W.*, 129 S.W.3d at 739.

*Parental Abilities*

The fourth factor, the parental abilities of those seeking custody of the child, is neutral or weighs slightly in favor of Father. Father's primary defense against the Department's accusations was witness testimony relative to his abilities as a father. Father presented the testimony of family members who spent time with him and H.F. while they lived in California from H.F.'s birth in 2004 until he was six or seven years old. His mother, Gloria Z., sister, Elizabeth C., and step-nephew, Sean B., each testified Father loved H.F. and provided him with excellent care, especially in light of H.F.'s psychological and physical disabilities. However, each witness admitted their personal knowledge of the relationship Father had with the children ended in 2010 or 2011, when Father, C.F., and H.F. moved from California to Texas. R.C. was born in Texas, and Gloria Z. and Elizabeth C. had only seen the family once since the move. Sean B. testified he never saw Father and R.C. together.

Father also presented the testimony of Ron Brown and Mary Lee. Both worked at Haven for Hope where Father and the children resided for three months before the removal. Brown worked at Haven for Hope as the shelter's ombudsman and testified he saw Father and the children every day around the shelter's campus and occasionally would speak with Father when Father came to Brown for advice or to air a complaint. Lee worked as the resident assistant in the dorm where Father and the children lived. Lee testified she saw Father and the children several times a day on the days she worked. Both testified Father was attentive and nurturing to the children and took advantage of programs available at Haven for Hope geared to improving his parental abilities, including working with a family counselor to improve his parenting skills.

The Department provided limited evidence to dispute the testimony pertaining to Father's day-to-day parental abilities. West monitored one of Father's few visits with R.C. She testified the visit went "all right," but when she told him to check R.C.'s diaper, Father told West to do it

herself. West testified she had to ask Father several more times before he checked and changed R.C.'s diaper

***Stability of the Home or Proposed Placement***

With regard to the seventh factor, the evidence established there was no stable home in which to place R.C. other than the foster home designated by the Department. As discussed, the evidence demonstrated Father could not provide a stable home for R.C.

Father argues the Department failed to properly investigate Father's home environment, thereby discrediting its conclusion he could not provide a stable home. However, West testified Father did not give her the opportunity to conduct a home study. West testified Father was hostile and aggressive and refused to cooperate with the Department, despite explanations from her and the trial court that cooperation was paramount to Father's attempt to regain custody of R.C. Father refused to provide West with any information related to his living situation, thereby making it impossible to investigate any home environment.

Father argues the Department failed to investigate whether Gloria Z., Father's mother, would be a good candidate for R.C.'s placement. Gloria Z. testified she wanted to adopt R.C.; however, she admitted she first expressed this desire to the Department only two or three weeks before the trial. Moreover, Gloria Z. resided in California. The timing of her involvement, coupled with the distance of her residence impeded the Department from conducting the investigation required to determine whether Gloria Z. could be considered as a candidate to adopt R.C.

In contrast, West testified R.C.'s foster family provided him a stable environment. R.C. adapted well and was well cared for. Moreover, the foster family intervened in the suit and conveyed a desire to adopt R.C. in the event parental rights were terminated.

### *Acts Indicating the Parent-Child Relationship was not a Proper One*

The eighth factor weighs heavily in favor of the trial court's finding. Throughout the pendency of the suit, Father demonstrated a pattern of aggressive and explosive behavior, and refused to cooperate with the Department or with the trial court in their attempts to reunite him with R.C.

Father failed to comply with the Family Service Plan set by the trial court, although he had been advised that adherence was required to regain custody of R.C. The Family Service Plan required Father to attend therapy, provide information to the Department and attend classes to address his exhibited problems with aggression. Despite Father's professed desire to have R.C. returned to him, the evidence presented revealed Father refused to cooperate with West or with the Department, lost his temper with two therapists, and though he did take the mandated parenting classes, he did not show any proof of attendance of the other required classes.

Notably, Father's behavior with the therapists is particularly concerning. As part of the Family Service Plan, the Department referred Father to therapist Carlos Castillo. At trial, Castillo testified that during the first session he asked Father about the allegations of sexual abuse. Father became "very irate and upset" and denied any sexual abuse or inappropriate kissing had occurred. Castillo stated he asked Father to calm down several times before Father eventually did. During the second session, Father again became irate and "went on a tirade," but this time refused to calm down, and Castillo escorted Father out of his office. Castillo testified it is not unusual for parents in Father's situation to become angry, but Father's aggression was extreme and abnormal. Based on behavior exhibited in these two sessions, Castillo concluded Father is "very explosive," and has "serious psychological issues." Castillo testified R.C. was not safe around Father due to his explosive, violent conduct.

After the second session, Castillo stated he did not feel comfortable providing therapy to Father, so the Department referred Father to a second therapist, Christopher Soulsby. Soulsby also conducted two sessions with Father. During the first session, Soulsby testified Father appeared fairly agitated and very upset about the Department's suit against him. The second session ended when Father became irate, jumped up from his seat, and stood over Soulsby in a loud and menacing manner. Soulsby testified he was frightened by Father's conduct and asked Father to leave. Soulsby also testified Father's display of anger and aggression was abnormal, and he never experienced anything similar to the confrontation he had with Father. At trial, Soulsby testified it was clear Father loved his children very much, and he saw sadness behind Father's rage. However, Soulsby testified he believed it would be difficult for Father to express himself appropriately to a child based upon Father's aggressive, explosive conduct.

Before making the final ruling, the trial judge expressed his concern with the pattern of aggression Father exhibited throughout the proceedings. The trial judge referenced the aggression Father showed toward West, Castillo, and Soulsby, and indicated Father had a number of outbursts in the courtroom, one of which ended with Father being handcuffed and escorted away from the courtroom. The trial judge also referred to Father's refusal to cooperate with the Department or participate in the trial court's efforts to reunite Father and R.C. as indicative that termination of parental rights to be in R.C.'s best interests.

## CONCLUSION

After determination and weight of the *Holley* factors and viewing the evidence in the light most favorable to that finding, we conclude the trial court could have reasonably formed a firm conviction that termination of Father's parental rights is in R.C.'s best interest. The weight of the evidence supporting the trial court's finding clearly established termination is in the best interest of R.C. Accordingly, the evidence is legally sufficient to support the trial court's finding.

After a complete review of the entire record considering evidence contrary to the trial court's finding, we conclude the trial court could reasonably have formed a firm conviction about the truth of the Department's allegations. Although Father presented evidence he was a kind and attentive parent to H.F. and R.C., the supporting witnesses were shown to have distant, uninformed relationships or limited contact with Father and R.C. Weighing the evidence presented through application of the *Holley* factors, the evidence contrary to the trial court's judgment does not outweigh or prevent a reasonable factfinder from forming a resolution consistent with the trial court's finding. Accordingly, the evidence is factually sufficient to support the trial court's finding that termination of Father's parental right is in R.C.'s best interest.

For the reasons discussed, we overrule Father's point of issue challenging termination of his parental rights. We, therefore, affirm the trial court's judgment. No costs shall be assessed against Father in relation to this appeal because he qualifies as indigent.

Jason Pulliam, Justice